MARY FORT ADAMS, ADMINISTRATRIX OF JOHN HAGAN, JUN., DECEASED, APPELLANT, *v.* JOHN S. PRESTON AND CAROLINE M. PRESTON HIS WIFE.

This court has never reviewed the judgment of an inferior court of a State, where there was an appeal to the Supreme Court of the State, upon a subject within the jurisdiction of such court, upon the allegation that its proceedings were irregular or illegal, and contrary to the law of the State.

The present is such a case.

The Parish Court of New Orleans had exclusive jurisdiction over property ceded by insolvents, and the courts of the United States have no jurisdiction over such insolvencies.

An allegation of fraud in a bill filed to review such proceedings in insolvency, which was afterwards abandoned, is not sufficient to give to the Circuit Court jurisdiction to review the proceedings of the State court.

Moreover, the complainant has no equitable claim to relief, his assignors having no mortgage lien on the property, when the judgments were assigned to the complainant.

THIS was an appeal from the Circuit Court of the United States for the eastern district of Louisiana.

The facts in the case were complicated, and not to be understood by a brief narrative. The reader is therefore referred to the opinion of the court, in which they are historically related.

It was argued by *Mr. Taylor* for the appellant, who also adopted a brief filed by *Mr. Steele,* and by *Mr. Benjamin* for the appellees.

*Mr. Taylor* made the following points:

I. A mortgage in the State of Louisiana, when duly inscribed in the register of mortgages, in the parish where the debtor has his domicil, will affect or bind the slaves of the debtor, no matter in what part of the State such slaves may be employed.

> C. C., 453, 454, 458, 461, 3246, 3247, 3248, 3250, 3216, 3238.
>
> C. M. Hyams *v.* McH. Smith, 6 An., 363.
>
> Patin *v.* Creditors, 9 L. R., 71.
>
> Hooper *v.* the Union Bank of La. et al., 10 R. R., 63; 11 R. R., 20.
>
> Cumming *v.* Bionalt, Curator, et al., 2 An., 794.
>
> Crouch *v.* Lockett, 3 An., 121.
>
> Bibb et al. *v.* Union Bank, 3 An., 324.
>
> Spencer *v.* Amis, 12 An., 127.
>
> Voorhies *v.* De Blanc, 12 An., 864.

II. No mortgage of any kind existed in favor of the heirs of Hampton upon the slaves, which are the object of the present action, on the 2d day of February, 1841, when they filed their intervention in the suit then depending in the Parish Court of New Orleans, wherein the syndics of the creditors of Thomas Barrett were plaintiffs, and Robert Bell was defendant, or at any time thereafter, nor did any privilege exist on them in favor of the heirs of Hampton; and these slaves were then affected by and subject to the judicial mortgages resulting from the judgments duly recorded against Thomas Barrett in the parish of New Orleans, where he had his domicil.

C. C., 3333.

Transcript, 104 to 108.

C. C., 2216, 3246, 3247, 3248, 3250, 3238, 3289, 3317, 3318, 3290.

III. The proceedings had in the case of the Syndics of the Creditors of Thomas Barrett against Robert Bell, in the Parish Court of New Orleans, upon the intervention of the heirs of Hampton, filed therein, were and are, so far as to the mortgage rights of the Union Bank on the property of the insolvent Barrett, *res inter alios acta*, and can have, in law or equity, no effect in sheltering the slaves in question from pursuit, when the object is to subject them to the operation of the judicial mortgages which existed in favor of that bank, at the time of making such intervention. Neither was there anything in the proceedings in the case of Thomas Barrett *v.* his Creditors which could have had any such effect.

Bullard and Curry's Dig., 479, and seq., secs. 44, 10, 11, 12, 44, 45, 46, 15, 16, 31, 35.

Brown *v.* Kenner, 3 M. R., 278.

Saul *v.* Creditors, 7 N. S., 425.

Rivers *v.* Hemstack, 2 R. R., 187.

Egerton *v.* Creditors, 2 R. R., 201.

Corion *v.* Millaudon, 3 An., 664.

Gravin *v.* Lafon, 7 N. S., 613.

Pandelly *v.* Creditors, 9 L. R., 387.

Morgan *v.* Syndics, 4 L. R., 174.

Morgan, Dorsey, & Co. *v.* their Creditors, 19 L. R., 84.

Suc. of A. Petayvin, 10 R. R., 118; 1 An., 92.

C. C., 1169, 1170.

Robert *v.* Creditors, 2 An., 535.

Lee *v.* Creditors, 2 An., 994.

West *v.* Creditors, 3 An., 532.

Williams *v.* Nicholson, 5 An., 720.

*Mr. Benjamin* made the following points:

I. The bill must be dismissed, for want of proper parties. This objection was taken in the court below, and is insurmountable

The bill prays to annul a judgment rendered in a suit between the syndics of Thomas Barrett and Robert Bell, and the heirs of Wade Hampton intervening; yet neither of the original parties to that suit is before the court, and only one out of the three intervening parties.

It seeks to set aside a sale made by Barrett's syndic and Robert Bell to the three heirs of Wade Hampton; yet none of the vendors are before the court, and only one of three purchasers is made party.

The bill attempts to excuse the want of parties that it admits to be necessary, by averring them to be beyond the jurisdiction of the court.

This excuse cannot avail.

Shields *v.* Barron, 17 Howard, 130.

Corion *v.* Millaudon, 19 Howard, 113.

II. The Parish Court of New Orleans was vested by law with full power over all the property ceded by the insolvent, and over the respective claims of the creditors. This jurisdiction has been exercised, and the regularity of the proceedings and legality of the action of that court cannot be reviewed in this court, which has no jurisdiction over the settlement of insolvencies in the State courts.

Any error or illegality in the proceedings of the Parish Court should have been corrected by appeal to the Supreme Court of Louisiana.

Tarver *v.* Tarver, 9 Peters, 174.

Gaines *v.* Chew et al., 2 How., 619, 644.

Fonvergne et al. *v.* City of New Orleans, 18 How., 471.

That the law of Louisiana vested in the Parish Court full and exclusive jurisdiction over the property surrendered, and the distribution of its proceeds amongst the creditors, is too clear to admit of dispute.

Insolvent Law of Louisiana, 1817.

Insolvent Law of Louisiana, 13th March, 1837.

Act of Louisiana Legislature, 1826.

All the property previously owned by the insolvent becomes vested in the creditors, represented by the syndic as their trustee.

Schroeder *v.* Nicholson, 2 L. R., 354.

Morgan *v.* Creditors, 7 L. R., 62.

Dwight *v.* Simon, 4 An., 492.

And all creditors who are parties to the insolvent proceedings are absolutely prohibited from seeking remedies in any other court, even of the State of Louisiana, than that in which the insolvency is pending.

Jacobs *v.* Bogart, 7 Rob. Rep., 162.

Marsh *v.* Marsh, 9 Rob. Rep., 46.

Tyler et al. *v.* Cred's, 9 Rob. Rep., 373.

And not only is this so, but previously-existing suits in other courts are all required by law to be transferred to the court having jurisdiction of the insolvency, and to be there cumulated with the insolvent proceedings.

Code of Practice, art. 165, sec. 3.

III. If, however, it be pretended that the Circuit Court had jurisdiction of the complainant's demand, on the ground of the frauds charged in the bill, the answer is, that those frauds are denied in the answer, and not one scintilla of proof has been offered in support of them.

The allegation that it was a fraud to claim a mortgage, because, in complainant's opinion, the effect of the mortgage had expired by lapse of time, without renewal of registry, is not worthy of serious refutation.

No attempt was made to prove any of the fraudulent combinations charged in the bill, and indignantly denied by the answer.

Indeed, the charge of fraud appears to be entirely abandoned, as not a word is said to support it in the elaborate brief filed by the counsel for appellant in this court.

IV. Should it be decided by the court that the foregoing points are not sustainable, and that the merits of the controversy between the parties are open for examination, then it is contended, in behalf of appellees:

1. That complainant has no such mortgage rights as are alleged by him, because these mortgages were cancelled many years before he acquired the judgments assigned to him.

These mortgages were cancelled by consent of complainant's assignor.

Independently of this consent, they were cancelled by the syndics by virtue of power vested in them by law, and this was done on the 2d June, 1841.

Act of 1817, sec. 31.

It is true that this act directs the proceeds of the property to be kept subject to the same rights in favor of mortgagees as they had on the property itself; but this mandate of the law, as to what is to be done with the proceeds of sale after the mortgage has been cancelled, cannot affect the legality of the erasure and cancellation ordered before the sale " in order to effect it."

These mortgages claimed by complainant were also ordered to be erased and cancelled by judgment of the court, rendered contradictorily with the Union Bank more than four years before the transfer by the bank to the complainant.

It is true that this last fact is not averred in the answer, and was not made a question by the pleadings, but it was proven by the record evidence introduced by complainant himself at the trial, and is conclusive against him.

The complainant seems to think that because the law provides that mortgages cease to have effect after a lapse of ten years from the registry, unless the registry be renewed, it is therefore in the power of a mortgagee to revive a mortgage legally cancelled and erased by the *ex parte* act of reinscribing it on the books of the mortgage office. No argument can be needed on such a pretension. If, however, the position of the complainant is misapprehended by us, we seek in vain for any other basis of his assertion in the bill, that he still holds the mortgages erased before his purchase of the judgments.

Observe, in the transfer from the bank to Hagan, the bank does not profess to sell any mortgage claims; does not pretend that there then, in 1849, existed any inscription of the judgments, but simply transfers its claims without any warranty. The idea on which this suit was brought is plainly an after-thought, and the suit itself purely a speculation in litigation.

Again: The appearance and action of the bank in the *concurso* or meeting of creditors, and fixing the terms of sale of the property, was a legal waiver of any right to follow the

property, and an agreement to look alone to the proceeds in the hands of their agents, the syndics.

Egerton *v.* Creditors, 2 Rob., 201.

Saul *v.* Creditors, 7 N. S., 446, 447.

Finally, the sale of the property by order of court in the artition suit extinguished the mortgages, and left the parties entitled to them no other recourse than to claim the proceeds of the sale. The law is the same in probate and insolvent sales.

Fabre *v.* Hepp, 7 Annual, 5.

Gilmore *v.* Menard, 9 Annual, 212.

Williamson *v.* Creditors, 5 Martin, 620.

Kohn, Syndic, *v.* Marsh, 3 Rob. R., 48.

2. That the rights of the Union Bank, as judgment creditors, were finally settled in the Parish Court; and that the judgments therein rendered for the application of the proceeds of the sale to the payment of Hampton's heirs, and the judgments finally homologating the accounts of the syndics, are final and conclusive adjudications of the subject matter of this suit, and form *res judicata* against complainant.

Morgan *v.* Creditors, 4 La. R., 174.

Ory *v.* Creditors, 12 La. R., 121.

Lang *v.* Creditors, 14 La. R., 237.

Smith *v.* De Lallande, 1 Rob. R., 384.

Egerton *v.* Creditors, 2 Rob. R., 201.

Corion *v.* Millaudon, 3 Annual R., 664.

And it makes no difference that the price was not actually paid to the syndics, but retained by Hampton's heirs in satisfaction of their claim, as this was their legal right.

Goodale *v.* Creditors, 8 La. R., 302.

Rodriguez *v.* Dubertrand, 1 Rob. R., 535.

Robert *v.* Creditors, 2 Annual, 535.

3. That complainant's claim is barred by prescription. It is important to remark that the complainant does not allege any recent discovery of the frauds charged in the bill, nor ignorance of the alleged frauds at a date immediately after they were committed, nor any difficulty in discovering them as soon as committed, if due diligence had been used.

Under these circumstances, the suit to annul the judgments and decrees of the Parish Court is barred by the lapse of one year..

Louisiana Code of Practice, 607, 613

And the mere lapse of time, long acquiescence, and laches of the complainant and assignors, from the sale in 1841 till the filing of the bill, in 1853, coupled with the fact that the complainant is a mere assignee of a right to file a bill in equity for fraud, form a sufficient ground for the dismissal of the bill.

2 Story's Eq. Juris., sec. 1520, and authorities there cited.

Prosser *v.* Edmonds, 1 Younge and Coll., 481.

Ward *v.* Van Bottelen, 2 Paige Ch. R., 289.

Warsham and al. *v.* Brown, 4 Georgia R., 284.

The complainant's right to enforce his mortgage, **even if it** ware valid, is prescribed by the lapse of ten years.

C. C., 3495, 3374, sec. 6; 3508, 3444.

Lawrason *v.* Minturn, 11 L. R., 256.

4. That the original inscriptions of the mortgages claimed by Hampton's heirs were valid, and that the registry of the sale from Leroy Pope to Barrett created a privilege in their favor, and operated as a valid reinscription of the original mortgages.

C. C., 3315, 3316.

Mallard & Armistead *v.* Carpenter, 6 Annual R., 397.

Sauvinet *v.* Landreaux, 1 Annual R., 220.

Ells *v.* Simms, 2 Annual R., 251.

Bonaffe *v.* Lane, 5 Annual R., 227. ·

5. And that the heirs of Hampton were legally and rightfully recognised as entitled to the privilege accorded by law to partnership creditors in the partnership assets.

C. C., 2806, 2794.

Mr. Justice WAYNE delivered the opinion of the court.

We have given our best consideration to this record, in connection with the minute statement made from it by the counsel of the complainant, without having been able to find any cause for the reversal of the judgment.

The plaintiff sued the defendants, John S. Preston and

Caroline M. Preston his wife, as the joint possessors of one hundred and thirteen negroes, and their increase, to subject them, and the revenues which had been derived from their labor, to the payment of certain judgments which the plaintiff says he owns, as the assignee of the Union Bank of Louisiana.

Those judgments had been obtained by that bank against Thomas Barrett, a resident of the city of New Orleans. He alleges that Barrett was the owner of the slaves when the judgments were obtained, and that, by reason of that fact, and the bank's assignment to him, he had a judicial mortgage upon them, their increase and revenues, to pay the judgments.

The suit was brought in the third District Court of New Orleans, when the defendants were sojourners there; and being cited to answer, they appeared. Being citizens of the State of South Carolina, they removed the cause to the United States Circuit Court for the eastern district of Louisiana, in which it was filed on the chancery side of the docket. There the defendants filed a dilatory exception, in bar of the action against them; which being overruled, they were required to answer. And they did so.

They neither admit nor deny the original validity of the judgments against Barrett, nor the assignment of them to the plaintiff; and they admit that the one hundred and thirteen slaves had belonged to Barrett; but giving at the same time their narrative of the manner in which Barrett had acquired title to them, and the judicial proceedings under which they bought the property. They state, in their answer, that Wade Hampton, of South Carolina, being the owner of Whitehall plantation, in the parish of St. James, in Louisiana, sold it on the 8th April, 1829, to Leroy Pope, for $100,000, payable in twenty years from the first day of January, 1830, with interest at six per cent. per annum, payable annually. That the seller took from Pope a mortgage on the plantation, and also an obligation that he would add to the plantation seventy working hands, and mortgage them to Hampton, with their increase, to secure the payment of Pope's purchase and interest. Pope, on the 23d of February following, complied with his obligation, by mortgaging seventy working hands and thirty-

one children to Hampton. He was then a resident of the parish of St. James.

Pope, two years afterwards, on the 18th March, 1833, sold the plantation and slaves to Thomas Barrett, of New Orleans, for $151,034. In payment, Barrett assumed to pay the debt of $100,000, and the accruing interest annually, to Hampton, and received the property, subject to the rights of Hampton upon the plantation and slaves. Two days afterwards, Barrett conveyed one-half of his purchase to Robert Bell, with an agreement that Bell's interest should be considered as having attached from the day of Barrett's purchase. Barrett failed to pay the interest; and Hampton being dead, his heirs brought suits for it, and these judgments were obtained against him in January, 1838, March, 1839, and April, 1839. The judgments were recorded in New Orleans, where Barrett lived; but the mortgages and conveyances given to Hampton, and his conveyance of the plantation, were recorded, when they were executed, in the parish of St. James, where the slaves were, and where Pope and Bell both lived.

Barrett became embarrassed, and applied for the benefit of the insolvent laws of Louisiana, on the 12th May, 1840. In the schedule of property surrendered to his creditors is found an item of Whitehall plantation and one hundred and fifty slaves, valued at $210,000, subject to the bond for $100,000, and the interest due thereon.

A meeting of Barrett's creditors was held on the 15th June, 1840. Syndics were elected by them, with general discretionary powers, *particularly with the power to sue for the partition of any property whatsoever held and owned by the insolvent jointly with others, and to claim partition in kind or by sale ;* also, to appoint agents for the disposal of property out of New Orleans. Amongst the creditors at this meeting who elected the syndics was the Bank of Louisiana, by its representative, its president. In October, after this meeting of the creditors, the heirs of Hampton intervened in the insolvent proceedings, claimed their rights under the mortgages upon Whitehall and upon the negroes; and they took a rule upon Magoffin and Morgan, the syndics of the creditors, to show cause why the

plantation and negroes should not be sold, and the proceeds applied to the payment of their claim. The rule was made absolute, by a judgment recognising their right as mortgagees, and ordering a sale of the property.

At a subsequent meeting of the creditors, at which the Union Bank of Louisiana was again represented by its president, the creditors gave to the syndics a power to raise all mortgages recorded against the insolvent on any estate owned by him alone, or jointly with other persons, which had been surrendered to his creditors, *with authority* to make partition of the same with the co-proprietors, either amicably or judicially.

Upon the petition of the syndics to the judge of the Parish Court of New Orleans, that act of the creditors was homologated, and the syndics were authorized by the court to do all which it empowered them to perform, by the votes of the creditors who appeared or who were represented at the meeting.

In conformity with such powers, the syndics instituted a suit, alleging that Whitehall plantation and slaves had been purchased for the joint account of Barrett & Bell, and that an action of partition was necessary, to enable them to liquidate that special partnership. They also asked that the proceeds of the crop made on the plantation might be deposited in bank, subject to the order of the court; that an inventory and appraisement of the property should be made, and returned into court; and that such proceedings might be had as would lead to a prompt and final settlement of the partnership.

Bell united in this petition, and declared himself to be a creditor of the partnership; prayed for a settlement of its affairs, and for the allowance in his favor of a lien on the partnership property, for such sum as might be found due to him.

The heirs of Hampton intervened in this partition suit, stating their claims upon the property as mortgage creditors; and insisted that the property should be sold, subject to the assumptions, by whoever might become at the sale vendee, for the payment of their claim, principal and interest.

On the 6th of February, 1841, the court gave a judgment, sustaining the claims of Hampton's heirs, and directing the sale of the property, with the condition, "that the vendees should assume the payment to Mary Hampton, John S. Preston and wife, and John L. Manning and wife, of $100,000, payable on the 1st of January, 1856, with six per cent. interest from the 1st of January, 1841; and, further, that it should be taken as a term and condition of the sale, that the purchaser should specially mortgage and keep mortgaged the plantation to the intervenors, and the eighty-one slaves described in the inventory, to them and their heirs and assigns."

The property was advertised and sold by the sheriff, pursuant to this judgment; was bought by the heirs of Hampton for $116,000; was paid for by surrendering to the sheriff the bond of Leroy Pope for $100,000, and by applying arrears of interest due on that bond to the payment of $16,000. An account was filed a few days afterwards, by the heirs of Hampton, of the whole amount due them, and after giving credit for the $116,000, and there was still remaining due $11,248.11½.

A rule was then taken on both the plaintiff and defendants, by the heirs of Hampton, for them to show cause why the account should not be approved, and their demand against the partnership of Barrett & Bell be liquidated, at the sum of $11,248.11½; and why the same should not be paid out of any money belonging to the partnership.

Upon the rule a judgment was rendered on the 23d April, 1844, according to its purport, declaring that, after having credited the account with $116,000, there was still due to the heirs of Hampton, by the partnership of Barrett & Bell, the sum of $11,248.11½, and a judgment was passed in their favor for that sum, against Mrs. Caroline Bell, the heir of Robert Bell, and J. B. Hullen, who had been elected the syndic of the creditors in the place of Magoffin and Morgan. A representative of the Union Bank was present, and voting for Hullen.

A final judgment was afterwards rendered, settling all matters in dispute between the parties to the suit. The proceeds

of the crop were appropriated to the payment of legal charges; and, that being insufficient for that purpose, the heirs of Hampton were required to pay $2,020.51, in satisfaction of them—it being declared that the legal charges were higher in rank than their privilege upon the copartnership fund. The heirs paid the amount, and that was a final settlement of all the matters in controversy between plaintiff, defendants, and intervenors.

Contemporary with the proceedings in the partition suit, the matters connected with Barrett's insolvency were concluded in the same court.

Among other acts done by the syndics, Magoffin and Morgan, was their petition to the Parish Court of New Orleans to be discharged from their office of syndics in the insolvency of Thomas Barrett and Thomas Barrett & Co. They annexed to their petition an account of the collections and disbursements which had been made by them since their last account had been filed. They showed that they were, as syndics, parties to a number of suits, which were still pending; refer particularly to the partition suit instituted by them, and still pending, against Robert Bell, as the partner of Barrett; pray that the creditors of the insolvent may be ordered to meet to elect other syndics, on account of their not being able to act longer in that capacity, as their private affairs compelled them to leave the State of Louisiana.

The court gave an order upon this petition, that the parties interested show cause, within ten days from the publication of the order, why the accounts of the syndics should not be homologated, why the funds stated by the syndics should not be distributed in accordance therewith, and why the syndics should not be discharged. And it further ordered, that a meeting of the creditors should be held on Wednesday, the 9th May, to elect another syndic in place of Magoffin and Morgan.

Such a meeting was held. James B. Hullen was elected by the creditors sole syndic, with all the powers which had been conferred by the creditors at former meetings upon Magoffin and Morgan. They were then discharged by the court from their functions as syndics, upon their paying the bal-

ances in their hands to the parties entitled thereto, reserving to themselves, however, whatever claim they might have on the sale of the Whitehall plantation; and James B. Hullen was confirmed as sole syndic of Barrett and Thomas Barrett & Co. This order was given by the court on the 20th May, 1842.

Seven days after the meeting of the creditors had been held, pursuant to the order of the court, Christopher Adams, jun., president of the Union Bank, filed a paper in the court, acknowledging himself to be fully cognizant of all the proceedings of the meeting; that he was present at it; that the bank was a creditor; that Hullen had been unanimously elected by the creditors sole syndic, in place of the former syndics, on the same terms and conditions that they had been, with the same powers which the creditors had conferred upon the former syndics. And further shows, that at the meeting on the 9th May, 1842, he had voted for the dispensation of Hullen from giving the security required by law to be given by syndics.

This narrative discloses the connection of the Hamptons with the proceedings of the syndics, and in the partnership suit which they had brought against Bell to settle his claim as a partner in the purchase of the Whitehall plantation and slaves. Thus matters remained for nine years, no one supposing that there was any irregularity in the judicial proceedings under which the heirs of Hampton had bought the property, the bank all the time acquiescing in the result. Indeed, nothing was done without the knowledge of the bank; everything that was done was with its approbation. The record shows that every step taken by the syndics for the settlement of Barrett's insolvency was in conformity with the powers which the creditors had given to them. But nine years after the final and conclusive settlement of the whole matter in controversy, the president and directors of the bank assigned to the plaintiff in this suit five judgments, which the bank had obtained against Thomas Barrett in 1838 and 1839. Upon this assignment it is that the plaintiff now claims that these judgments were a mortgage upon the Whitehall plantation and slaves. He

alleges that all the proceedings in the Parish Court of the parish and city of New Orleans, in the matter of the insolvency, were irregular; that the disposition of property surrendered by Barrett for his creditors, and the creditors of Thomas Barrett. & Co., "were irregular, insufficient, null, and void," and had been procured by fraudulent combination between the heirs of Hampton with Bell, and with the syndics of the creditors, for the purpose of defrauding the Union Bank particularly. He also alleges that the Union Bank has not been a party to the suit of the syndics, and that neither the bank nor himself are in any way bound by its proceedings. And the fraud with which he charges the defendants is, that they claimed as creditors of Barrett, under the mortgage which Leroy Pope had made to their ancestor, Hampton, when the plantation was bought from him, and which Barrett assumed to pay when he purchased from Pope, well knowing at the time that the efficacy of the inscription of the mortgages upon both plantation and slaves had expired, according to law, without any renewal of the registry of them. The defendants deny, in their answer, the fraud charged, or fraud of any kind, in their intervention in the proceedings in insolvency. No attempt was made to prove it; consequently, the plaintiff's whole case depends upon his assertion that there are irregularities in the suit, and in the rendition of a judgment, and under which the heirs of Hampton purchased the property at sheriff's sale, which made that judgment a nullity. The plaintiff is the assignee of the Union Bank, and the argument in support of his claim as assignee is, that he is entitled to a judgment, subjecting the property to the payment of the judgments which the bank had obtained against Barrett, unless the mortgages of the bank were extinguished by the sale made by the sheriff to the heirs of Hampton, and unless the settlement between the syndics, Robert Bell, and the heirs of Hampton, upon the judgments rendered in the cases of the syndics and Bell, are *res judicata.*

These positions are in themselves an abandonment of the charge of fraud, originally made, and for no other purpose than to give to the Circuit Court jurisdiction of the case

against the defendants, and without which the court could not have taken jurisdiction. With what propriety, then, can this court now be called upon to review a judgment of the Parish Court of New Orleans for any irregularity or illegality in the proceedings of that court, if either existed, when there could have been an appeal to the Supreme Court of Louisiana for its correction? This court has never done so in any case in which the subject matter of a suit, being within the jurisdiction of a State court, upon the allegation that its judgment had been given contrary to the law of a State. See the cases of Fonvergne et al. *v.* City of N. O., 18 Howard, 471; Gaines *v.* Chew et al., 2 Howard, 619, 644; and Tarver *v.* Tarver, 9 Peters, 174. The Parish Court of New Orleans had, by law, full power over all the property ceded by the insolvent, and over the claims of each of the creditors. It exercised its jurisdiction, and the legality of its judgment cannot be questioned by this court. Besides, the courts of the United States have no jurisdiction over the settlement of insolvencies in the State courts. The Parish Court had not only jurisdiction, but exclusive jurisdiction, over the property surrendered, and the distribution of it among the creditors of the insolvent. By the laws of Louisiana, the property surrendered becomes vested in the creditors, represented by the syndics as their trustee. Schroeder *v.* Nicholson, 2 Lou. R., 354; Morgan *v.* Creditors, 7 Lou. R., 62; Dwight *v.* Linn., 4 An., 492. And the creditors of an insolvent who become parties to the insolvent proceedings are prohibited from seeking remedies in any other court of the State of Louisiana. Jacobs *v.* Bogart, 7 Rob. Rep., 162; Marsh *v.* Marsh, 9 Rob. Rep., 46; Tyler et al. *v.* Creditors, 9 Robinson. It is also declared, in the Civil Code, (art. 165, sec. 3,) "that, in all matters relative to failures, all suits already commenced, or which may be subsequently instituted against the debtor, must be carried before the court in which the failure has been declared;" and "where a party claims from the syndics goods which had been surrendered by an insolvent, the suit may be brought before the court where the *concurso* is pending." 2 Robinson, 348.

The want of jurisdiction, then, in the courts of the United States, to review the proceedings of the Parish Court of New Orleans, in a case of insolvency, is, of itself, sufficient to prevent the court from giving to the plaintiff a decree in this suit.

There are, however, other grounds sufficient, to be found in the record, from which we have concluded that the plaintiff has neither an equitable claim against the defendants in this proceeding, nor any right, under the law of Louisiana, to subject the property in controversy to the judgments of which he is the assignee. But we shall confine ourselves to the discussion of one of them.

The judgments of the Union Bank, if they ever had at any time mortgage rights against the Whitehall plantation, and the slaves upon it, better than the mortgages given by Leroy Pope at the time of his purchase, and which were assumed by Barrett when he bought the property, and which were equally obligatory upon Bell, when himself and Barrett formed their particular partnership in respect to that property, those judgments had been legally cancelled before they were assigned to the plaintiff by the bank. It will be found, at pages 20 and 21 of the record, that the assignor of the plaintiff united with the other creditors in giving to the syndics the power to raise all mortgages granted by or recorded by Thomas Barrett, or Thomas Barrett & Co., on any real estate owned by Barrett, jointly with other persons, and surrendered by him to his creditors, with power also to effect partitions of the said property with his co-proprietors, either amicably or judicially, &c., &c.

The creditors, too, authorized the syndics, or either of them, to vote, deliberate, and give their opinion for them, at any subsequent meeting of the creditors of Barrett, or Thomas Barrett & Co. And the powers so given to the syndics were homologated by the judge of the Parish Court of New Orleans. Under such a power, the syndics might have erased the judicial mortgages of the bank in the fair and bona fide discharge of their relation to the creditors as their trustees, and the bank would have been bound by their action. But

they proceeded, according to law, to have the judicial mort-gages of the bank cancelled; and they were cancelled on the 1st of February, 1841. This cancellation was made by the syndics, in conformity with the thirty-second section of the act of February, 1817, entitled, "An act relative to the voluntary surrender of property, and to the mode of proceeding, as well for the direction as for the disposal of debtors' estates," &c., &c. The erasure and cancellation of mortgages may be made in Louisiana, by consent or by order of the court. Articles 3335, 3336. In this instance, the erasure was made by the judgment of a court of competent jurisdiction; when by the latter, it has the effect of a *res judicata.* 7 Rob., 382, 518; 11 Rob., 171. After the erasure so made, there can be no subsequent reinscription of a mortgage. That which was made in 1848 revived no lien upon the property which the bank's mortgages may have had before they were erased. But there was another erasure of the bank's judicial mortgages in a suit brought by Barrett against it, before its assignment war made of its judgments against Barrett to Hagan, the plaintiff. Rec., 83, 88, 94, 99, 103. It was done by a court having competent jurisdiction, and it concluded the right of the bank to convey its judgments to the plaintiff as judicial mortgages, though they might be transferred as judgments to entitle the assignee to a participation in any unadministered proceeds made from the sale of the property surrendered by the insolvent for his creditors. But neither the reinscription of 1848, nor the assignment to the plaintiff, could have the effect to give to the plaintiff any claim upon property of the insolvent which had been sold under the judgment of a court having jurisdiction in insolvency. The property now claimed by the plaintiff, as subject to his assignment, had been recognised by the judgment of the Parish Court to be subject to the claims of the heirs of Hampton; had been ordered by the court to be sold by the sheriff; had been sold by him, and adjudicated to the purchasers; and the consideration money of the purchase had been accounted for by the sheriff to the syndics of the insolvent, and by them accounted for to the court, in strict accordance with its order, nine years before the bank made an

assignment to Hagan. The sale could not have been in any way subject to the judicial mortgages of the bank, nor could it in any way affect the property purchased by the defendants. Indeed, there can be no doubt that, after the appearance of the bank in the *concurso* of the creditors, and its acquiescence with them in fixing the terms for the sale of the property of the insolvent, it must be taken as a waiver by the bank of all its rights to pursue it for the payment of its judgments against Barrett, the insolvent, and that it would look to the proceeds of its sale, as the other creditors did, for the satisfaction of their respective claims. Egerton v. Creditors, 2 Rob., 201; Saul v. Creditors, 7 N. S., 446, 447. Without pursuing the discussion further, we have concluded that the bank, when it assigned its judgments to the plaintiff, had no mortgage lien on the Whitehall plantation and slaves to transfer; that the language of the assignment, interpreted by the acknowledged acts of the bank in the insolvency, cannot mean any such transfer, and that the judgment and sale under the partition suit barred the bank from making such an assignment, and the plaintiff from any such claim as he has made in his bill.

We direct the affirmance of the decree of the Circuit Court.